# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **BARBARA DAIGLE BATULIS** | * | **CIVIL ACTION NO. 11-0740** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Barbara Batulis, born June 13, 1946, filed an application for a period of disability and disability insurance benefits on April 3, 2007, alleging disability as of July 1, 2005, due to back problems, peptic ulcer disease, depression, hypertension, and cardiovascular disease.[1]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

---

[1] Claimant remained insured through September 30, 2007. [rec. doc. 12, p. 1, n. 1; Tr. 20). Thus, claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:[2]

**(1) Records from Dr. James Eddy dated January 23, 2006 to December 29, 2006**. On January 23, 2006, claimant complained of uncontrolled low back pain since an injury in 1992, which was aggravated in July after she lifted a 50-pound feed bag. (Tr. 163). She reported that the pain radiated into the left leg and ankle with numbness and tingling once in the past week. She had a history of a heart attack, hypertension, and a stomach ulcer. (Tr. 164).

On examination, claimant had tenderness at L4 and L5, no muscle spasm, severe low back pain on the left with flexion, and radicular pain on the left. (Tr. 165). Muscle strength was 5/5 with 4/5 in the left anterior tibialis, and reflexes were normal. Straight leg raising was positive on the left.

Neurologically, claimant's judgment and insight were normal, memory seemed normal. Her mood and affect seemed normal.

Dr. Eddy's assessment was lumbosacral neuritis or radiculitis, unspecified. He recommended injections.

---

[2]Although the undersigned has reviewed all of the medical records, only those relating to the arguments raised by claimant are summarized herein.

On December 29, 2006, claimant reported that she had improved initially following the injection, but it did not last. (Tr. 166, 556). She also complained of trouble sleeping, anxiety, and feeling depressed. Her medications included Darvocet, Lexapro, and Lunesta.

Dr. Eddy prescribed Celebrex. (Tr. 167). He noted that claimant had gotten very short-term relief from three injections, had new findings on MRI, and had developed numbness in one foot. (Tr. 168, 169-71). He recommended surgical evaluation. (Tr. 168).

(2) **Records from Dr. Christopher Achee dated October 24, 2004 to July 25, 2007**. On July 5, 2005, claimant complained of low back pain beginning two weeks prior after she had lifted some heavy bags of feed. (Tr. 428). The pain radiated to the left knee.

Examination revealed positive straight leg raising on the left and decreased sensation to light touch in the left lateral thigh. Motor was 5/5, and reflexes were 2+ in the lower extremities. Sensation was decreased to light touch in the left lateral thigh.

Dr. Achee's impression was lumbar radiculopathy. He recommended home exercises and prescribed Darvocet.

On October 7, 2005, claimant complained of low back pain with stiffness and radiation into the left thigh and ankle. (Tr. 427). Dr. Achee referred her for physical therapy. On October 28, 2005, claimant reported minimal improvement with physical therapy. (Tr. 426).

An MRI dated November 7, 2005, showed degenerative disc and bony changes with spinal stenosis and bilateral lateral recess stenosis at L4-5. (Tr. 319).

On February 10, 2006, claimant reported that a steroid injection had dramatically improved her back pain, but she continued to have left leg radiculopathy. (Tr. 424). Dr. Achee ordered another injection and physical therapy.

On September 14, 2006, claimant continued to have low back pain, and was unable to walk 200 feet without pain. (Tr. 420). Dr. Achee recommended a functional capacity evaluation.

A Functional Capacity Evaluation Report performed by Mark Gremillion, OT, on September 27 and 29, 2006, showed that claimant's functional status was that of a sedentary/light physical demand level. (Tr. 387-89).

On October 25, 2006, claimant complained of continued low back pain. (Tr. 419). She was having to take Darvocet four times per day. Her prescription was refilled.

On December 8, 2006, claimant complained of severe, worsening back pain radiating into the left leg with associated numbness in the left foot and toes, and occasional weakness. (Tr. 417). Her medications had helped. Her motor strength was 4+/5 in left knee and toe extension and 5/5 elsewhere. Sensation was intact. The assessment was low back pain, for which she was referred for an injection.

An MRI dated December 14, 2006, showed degenerative disc and bony changes with spinal stenosis, bilateral recess stenosis, mild narrowing of the neuro foramina bilaterally at L4-5 associated with a 12 x 18-mm synovial cyst extending into the spinal canal, and the origin of the left neuroforamen and the left lateral recess from the left facet joint associated with the hypertrophic facet joint disease. (Tr. 201-02).

Claimant was referred to Dr. Gregory J. Rubino for neurosurgical consult. On January 29, 2007, she complained of low back pain extending into the left leg and foot with numbness and tingling. (Tr. 399). Physical therapy had not helped.

Neurological examination was normal. (Tr. 402). Motor examination showed 5/5 strength. Muscle tone and size were normal. Reflexes were normal. Sensation to light touch in the left leg was 50% of normal.

Lumbar spine examination revealed moderate tenderness at L5 on the left. Flexion was moderately limited, but asymptomatic. Extension was mildly limited.

Dr. Rubino's impression was low back pain with sciatica. (Tr. 403). He noted that she had an 18-month history of left L5 and S1 radicular pain, numbness, and weakness. The L4-5 cyst did not appear to compress the left L4 nerve root, and he could not explain her upper leg numbness. He opined that the majority of her symptoms fell within the L5 and S1 distributions, and were clearly caused by the synovial cyst.

Because claimant had failed multiple trials of physical therapy and epidural steroid injections, Dr. Rubino recommended that she proceed with a left L4-5 hemilaminotomy and removal of the synovial cyst. She was in the midst of a GI evaluation for pancreatic lesions and was recovering from a recent flu, so he recommended that she complete her abdominal evaluation and call when she wished to schedule surgery.

On May 24, 2007, claimant saw Dr. Achee for continued complaints of low back pain. (Tr. 414). Her hypertension was controlled, and coronary artery disease was stable and asymptomatic. He refilled her prescriptions, including Lexapro.

On July 25, 2007, claimant complained of depressed mood, isolation, anhedonia, and increased sleep and family stress. (Tr. 413). Dr. Achee increased her dose of Lexapro.

**(3) Physical Residual Functional Capacity ("RFC") Assessment dated September 13, 2007**. A non-medical examiner conducted the RFC assessment and determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and about six hours in an eight-hour workday, and had unlimited push/pull ability. (Tr. 473-80).

**(4) Medical Consultant's Review of Physical RFC Assessment dated September 18, 2007**. Dr. Yondell Moore agreed with the RFC assessment. (Tr. 485-86).

**(5) Psychiatric Review Technique ("PRT") from Charles F. Bridges, Ph.D., dated October 1, 2007**. Dr. Bridges determined that there was insufficient evidence to make a determination. (487-500). He noted that the mental impairment appeared to be non-severe prior to a few months before the 7/25/2007 note. (Tr. 499).

**(6) Record from Bryan L. Bolwahnn, Ph.D., dated November 16, 2007**.

Claimant alleges that she was in too much pain and was physically unable to work. (Tr. 503). She complained of a history of depression, which she said was first diagnosed in June, 2005, after her back injury. She was taking Lexapro and Ambien 12.5 mg.

7

Claimant appeared to have mild impairments in social functioning. Her social interactions had decreased significantly related to her depression symptoms. Her activities of daily living were noted to be impaired. She was able to care of grooming, taking medicine, driving short distances, and simple cooking.

On mental status exam, claimant appeared to be depressed as evidenced by a dysphoric mood and tearfulness. (Tr. 504). She reported transient thoughts of suicide. Memory was mildly impaired. Concentration was not impaired.

Claimant could perform simple two-step mathematical operations. Her intellectual functioning was expected to be above average. She was able to understand and follow simple instructions. Abstract reasoning was good.

Dr. Bolwahnn concluded that based on the clinical information presented, claimant would be considered capable of handling any funds that might be awarded to her. He estimated that her prognosis for improvement was guarded. He noted that she had a lot of physical health problems which appeared to be her primary difficulty at that time.

**(7) Records from Michael Monic, L.P.C., dated March 4, 2008 to December 18, 2008**. Claimant was seen by Michael Monic for depression. (Tr. 528). His clinical impression was major depression, recurrent, moderate. Her

Global Assessment of Functioning Score was 50.  She received counseling from March 27, 2008 to December 18, 2008.  (Tr. 525-528; 567-79).

**(8 ) Records from Dr. Christopher Achee dated October 17, 2008 to January 28, 2009**.  On April 7, 2008, claimant presented with depression.  (Tr. 588).  The previous week, she had had anhedonia, crying spells, and decreased energy.  On examination, she had depressed mood and poor eye contact.  Dr. Achee increased her Effexor.

On October 23, 2008, Dr. Achee noted that claimant had presented to him in October, 2005, with acute onset low back pain.  (Tr. 547).  His ultimate diagnosis was lumbar spine degenerative joint and disc disease with a synovial cyst.  She was initially prescribed physical therapy and Darvoct, but did not improve.

Dr. Achee stated than an MRI dated November 7, 2005, revealed degenerative disc and prominent degenerative arthritis in the lumbar spine especially at the L3-S1 levels with bilateral recess stenosis and spinal stenosis.  He further noted that she underwent a series of epidural steroid injections, but did not improve.

Based on his evaluation, the functional capacity evaluation, and the duration of claimant's symptoms, Dr. Achee opined that claimant was "unable to perform

9

full-time work and is disabled. This disability can be expected to last the remainder of her lifetime."

In the Spinal Impairment Questionnaire, Dr. Achee wrote that he had treated claimant from November 9, 2004 to October 16, 2008. (Tr. 458). Her diagnosis was DJD and spinal stenosis of the lumbar spine. He stated that her prognosis was fair to poor.

Dr. Achee stated that claimant's lumbar spine range of motion was limited to 80 degrees. She had tenderness and muscle spasm at L4-5 of the left paraspinal muscle. (Tr. 549). She had reflex changes in the knees at 3+ and in the left ankle at 1+. She also had abnormal gait.

The MRI dated December 14, 2006, showed mild degenerative changes of the lumbar spine with a left L4-5 synovial cyst compressing both the L5 and S1 nerve roots. (Tr. 550). Claimant had pain with prolonged sitting. Her pain was in the lower back radiating into the right hip and down the entire left leg to the lateral aspect of the foot. Her pain was relieved with Darvocet, but incompletely and with side effects. (Tr. 551).

Dr. Achee opined that claimant could sit for three hours and stand/walk for four hours in an eight-hour day. He recommended that she not sit continuously, and get up and move around every 15 to 60 minutes for five minutes. He also

stated that she should not stand/walk continuously in a work setting. He opined that she could lift up to 10 pounds frequently and 20 pounds occasionally, and carry five pounds frequently and up to 20 pounds occasionally. (Tr. 551-52).

Dr. Achee stated that claimant's pain seldom was severe enough to interfere with attention and concentration. (Tr. 552). He opined that her impairments were ongoing, and expected to last at least 12 months. He stated that anxiety regarding worsening pain and decreased ability to work affected claimant. He wrote that she was capable of tolerating low stress, but had difficultly coping with high stress situations.

Additionally, Dr. Achee stated that claimant would need to take unscheduled breaks every 15 minutes to an hour for five to 10 minutes. He stated that her condition did not interfere with her ability to keep her neck in a constant position. He estimated that she would be likely to miss work about two or three times per month. He checked that other limitations affecting her ability to work included psychological limitations, her need to avoid heights, and no pushing, pulling, bending, or stooping. He opined that the earliest date that her description of symptoms and limitations applied was January, 2006.

**(9) Claimant's Administrative Hearing Testimony**. At the hearing on June 25, 2009, claimant testified that she had past work experience as a registered

nurse. (Tr. 34). She had last worked as a nurse in 2005. (Tr. 39).

As to activities, claimant testified that she did the dishes, did laundry, and drove once or twice a week (Tr. 47-49). She watched television and did a lot of reading. (Tr. 50). She walked on her property and on the treadmill for about 12 minutes. (Tr. 50-51). She also went to Grand Isle at least once a month, attended church, went to movies and club meetings, and attended LSU football games. (Tr. 53-54).

Additionally, claimant testified that she went out to eat twice a week. (Tr. 52). She also played with her poodles, visited her friends every two or three weeks, and had visitors once or twice a week.

Regarding complaints, claimant testified that she had been having problems with depression since she had hurt her back. (Tr. 43). She reported that Dr. Achee had referred her to a counselor in December of 2007. (Tr. 42, 45). She also complained of back pain and a severe ulcer. (Tr. 44). She stated that during a typical week, she had five bad days and two good days. (Tr. 50).

**(10) Administrative Hearing Testimony of Jeffrey J. Peterson, Vocational Expert ("VE")**. Mr. Peterson classified claimant's past work as a nurse as medium to very heavy with an SVP of 7. (Tr. 36-37). He testified that

12

she had skills which were transferable to light and sedentary work with very little vocational adjustment. (Tr. 37, 40).

The ALJ asked the VE whether, considering claimant's age of 60, she would have skills transferable to light work. (Tr. 37). In response, he identified the jobs of physician's office nurse, of which there were 212,000 positions nationally and 2,500 statewide, and case manager, of which there were 30,000 jobs nationally and 200 to 300 statewide. (Tr. 39, 54-55). Additionally, he identified light duty positions with home health agencies, of which there were 127,000 jobs nationally and 1,200 statewide. (Tr. 55).

When the ALJ asked whether claimant had skills that would transfer to sedentary work, the VE opined that they would require more than very little vocational adjustment. (Tr. 40, 56). Finally, when the ALJ inquired whether any jobs were available to a claimant who needed to lie down for longer than a standard number of breaks, Mr. Peterson responded that there would not. (Tr. 56).

**(11) The ALJ's Findings**. Claimant argues that: (1) the ALJ failed to follow the treating physician rule; (2) the ALJ failed to properly evaluate her mental impairments; (3) the ALJ failed to properly evaluate her credibility, and (4) the ALJ relied upon flawed vocational expert testimony. Because I find that the ALJ failed to properly evaluate the opinions of claimant's treating physician and

her mental impairments, I recommend that this matter be **REMANDED** for those determinations prior to her date last insured.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

Here, the ALJ adopted the opinions of the state agency "medical" consultants from September, 2007, indicating that claimant could sustain the exertional demands of light work.  (Tr. 25).  However, only one of these

consultants was a physician.  (Tr. 473-80; 485-86).  Under the Social Security Regulations, it was improper for the ALJ to give more weight to the opinion of a non-treating physician and a non-medical consultant than the treating physician's. *See* 20 C.F.R. § 404.1527(d)(1) ("[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you") and § 1527(d)(2) ("[g]enerally, we give more weight to opinions from your treating sources").  (Tr. 473-80).

Additionally, the ALJ referred to Dr. Achee's response to the Spinal Impairment Questionnaire indicating that since 2006, claimant was limited to pushing, pulling, lifting, and carrying about 20 pounds occasionally and 10 pounds frequently; sitting for three hours; standing and walking for four hours, and limited as to bending, kneeling, stooping, crouching, and crawling.  (Tr. 24; 547–54).

However, he did not give any basis for declining to give weight to Dr. Achee's opinion.  Further, despite this opinion, the ALJ noted that "no doctor has placed any restriction of activities of daily living on her that are inconsistent with the above RFC [from the state agency consultants]."  (Tr. 25).  Besides the fact that this statement is inaccurate, the ALJ's decision does not comply with the Fifth Circuit's standard for rejecting this treating physician's opinion.

In *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), the court held that an

ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. *Id*. at 621 (*citing Newton,* 209 F.3d at 456). The ALJ did not consider those factors in this case. Thus, the undersigned finds that this constitutes error.

Further, the ALJ cited Dr. Bolwahnn's report indicating that claimant suffered from adjustment order and depressed mood, and that she had had dysphoric mood, tearfulness, and difficulty sleeping since she had injured her back and became unable to work in June, 2005. (Tr. 25; 503-05). He noted that claimant did not start receiving any psychological treatment until 2008, and found that her statements concerning the intensity, persistence and limiting effects of her mental impairment were not credible.

The social security regulations for mental impairments provide that "[p]roper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long

period prior to the date of adjudication to establish your impairment severity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(2).

Claimant reported to Dr. Bolwahnn that she had a history of depression which was first diagnosed in June, 2005, following her back injury and inability to work. (Tr. 503). Although the ALJ accurately noted that claimant did not receive counseling until 2008, the record reflects that she had complained of, and had been taking medication for, depression prior to her date last insured. (Tr. 166, 413-14). Thus, the undersigned finds that the ALJ failed to properly assess claimant's mental impairment.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the sixth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to re-evaluate Dr. Achee's opinion as to her physical residual functional capacity and to reassess her mental residual functional capacity prior to her date last insured.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten

(10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed September 25, 2012 at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE